No. 01-013

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 49

IN RE THE MARRIAGE OF

BENNY LIONELLO BEE, JR.,

Petitioner and Appellant,

and

RENN SUZANNE LYMPUS BEE,

Respondent and Respondent.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Susan P. Watters, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Phyllis M. Quatman, Quatman & Quatman, Whitefish, Montana

For Respondent:

Bruce McEvoy, Warden, Christiansen, Johnson & Berg, Kalispell, Montana

Submitted on Briefs: October 4, 2001
Decided:  March 19, 2002
Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Benny Lionello Bee, Jr. (Benny) appeals the judgment of the Eleventh Judicial District Court, Flathead County, Montana, regarding child support, maintenance, property distribution and award of attorney fees in the dissolution of his marriage with Renn Suzanne Lympus Bee (Renn).  We affirm.

¶2    Benny raises the following issues on appeal:

¶3    1.  Did the District Court err by imputing income to Benny for the purpose of setting monthly child support payments?

¶4    2.  Did the District Court abuse its discretion by ordering spousal maintenance at $500 per month until Renn finishes her education?

¶5    3. Did the District Court err by valuing and distributing marital property and debts without a hearing?

¶6    4.  Did the District Court abuse its discretion by assigning Renn's attorney fees to Benny?

¶7    Benny and Renn married on November 29, 1996, in Flathead County, Montana.  The twins born of the marriage on February 10, 1999, are named Ezra Benlionello and Isabella Suzanne.   At the time of the trial, Benny and Renn were 35 and 29 years of age, respectively.

¶8    Benny filed a petition for dissolution of marriage in Flathead County on January 18, 2000.  Renn is the daughter of  the Honorable Ted O. Lympus of the Eleventh Judicial District Court, and several district court judges accordingly recused themselves from this matter.  At the request of the Honorable Katherine Curtis, this Court issued an Order that assigned the case to the Honorable Susan P. Watters of the Thirteenth Judicial District.  Concurrent with that Order, Benny petitioned this Court for a writ of supervisory control on January 29, 2000, seeking the appointment of a disinterested judge to review his pending request for temporary parenting of the twins and preside over the dissolution proceedings.

¶9    On February 15, 2000, the District Court held a hearing on the parties' respective motions for an interim parenting plan and temporary child support. Benny sought full time parenting of the twins and alleged negligent supervision by Renn and unreasonable restrictions on his visitation.  At the hearing, Benny presented medical testimony that characterized an injury to Isabella's arm as an unusual, long-bone break that was inconsistent with a fracture sustained by a child falling on the floor from a standing

position.

¶10 Following the hearing, the parties stipulated to an interim parenting plan, which gave Renn primary residential parenting of the twins and included interim child support, insurance payments, and a regularized visitation schedule. The court approved the interim parenting plan on February 25, 2000. The parties entered a more detailed interim plan on August 9, 2000.

¶11 The trial ensued on October 26, 2000, during which the District Court took evidence on the past, present and future earning potential of the parties in order to determine child support obligations. Benny was employed by Bee Broadcasting, Inc., a business owned by his father, Benny Bee, Sr., for most of his working career. During the marriage, Benny worked as an operations manager, overseeing four radio stations, and earned approximately $90,000 per year. Upon the parties' separation in November 1999, Benny moved from the marital home to a house owned by his father. Within a month, he quit his job and remained unemployed for the next five months. Benny returned to Bee Broadcasting as a program manager on April 1, 2000, earning $45,000, which was half his prior salary, plus commissions. Approximately one week before trial, Benny left this job and became a music consultant to Bee Broadcasting for $2,500 per month. Benny Bee, Sr., testified that Bee Broadcasting would continue to pay Benny $30,000 per year in consulting fees regardless of whether Benny obtained full time employment elsewhere. At the time of trial, Benny's earnings for the year 2000 were $44,505.

¶12 Benny testified that he planned to relocate in Seattle, Washington, and estimated a radio program manager in the Seattle area would earn from $40,000 to $45,000 per year. Benny Bee, Sr., testifying as an expert, stated the average salaries in the Pacific Northwest ranged from $42,000 for an afternoon programer up to $100,000 for a morning radio personality. Benny's father explained that one must work into a morning programming slot, and that Benny possessed the requisite talent, ability and perseverance to achieve such a position.

¶13 During the marriage, Renn worked as a bank teller and as a bookkeeper for Bee Broadcasting and earned about $21,000 annually, according to her 1997 and 1998 tax returns. After the birth of the twins, Renn became a full-time homemaker and caretaker. Upon separation, Renn moved with the twins to her parents' home and then relocated to Missoula, Montana, where she planned to complete her Bachelor of Science degree at the University of Montana, followed by training as a surgical technician at the College of Technology. Renn anticipated completing her education in May 2002. As a full-time student, Renn received a Pell grant of $3,300, which paid her tuition, fees and books, and a student loan of $2,300 for the fall 2000 semester.

¶14 The District Court entered the findings of fact, conclusions of law and decree of dissolution on November 20, 2000, from which Benny appeals.

I.

¶15 Did the District Court err by imputing income to Benny for the purpose of setting monthly child support payments?

¶16 A key issue on appeal is the District Court's imputation of income. At time of trial, Benny had a stated annual income of $30,000 per year. Although Benny hoped to find work in Seattle that paid an

additional $45,000 per year, he had not yet secured a position. Nonetheless, the District Court imputed to Benny $75,000 in annual income.

¶17    Renn argues that Montana law allows imputation of income when a parent is voluntarily under-employed. She contends that Benny intentionally reduced his income prior to trial by leaving full-time employment and maintains Benny has excellent earning potential that affords him the opportunity to significantly increase his income in the near future.

¶18    Benny counters that the court's determination of child support, as well as its orders for spousal maintenance, allocation of the deficiency debt and equitable assignment of attorney fees, hinges on whether the $45,000 additional annual income imputed to Benny by the court constitutes an abuse of discretion.

¶19    We review a district court's award of child support to determine whether the district court abused its discretion. In re Marriage of Craib (1994), 266 Mont. 483, 490, 880 P.2d 1379, 1384. A presumption exists in favor of the judgment, and a district court will be reversed only upon a clear abuse of discretion. In re Marriage of Chiovaro (1990), 247 Mont. 185, 189, 805 P.2d 575, 577.

¶20    In a proceeding for dissolution of marriage, a district court must order either or both parents owing a duty of support to a child to pay an amount reasonable or necessary for the child's support. Section 40-4-204(1), MCA. The Montana Child Support Guidelines, adopted by the Department of Public Health and Human Services under the authority of § 40-5-209, MCA, state that income should be imputed when a parent is under-employed or has an unknown employment status. 37.62.106(7)(b) and (d), ARM (1998). The Guidelines must be used in all cases, unless the court finds by clear and convincing evidence that the application of the standards and guidelines is unjust in a particular case. Section 40-4-204(3)(a), MCA. Courts will attribute imputed income to a parent based on:

   a) the parent's earning potential if employed full time;
   b) the parent's recent work history;
   c) occupational and professional qualifications;
   d) prevailing job opportunities in the community and earning levels in the community.

37.62.106(6), ARM.

¶21    The Guidelines also state that income should be imputed to a parent who is a full-time student. 37.62.106(7)(e), ARM. However, income should not be imputed if the reasonable costs of child care for dependents in the parent's household would off-set in whole or substantial part the parent's imputed income. 37.62.106(9)(a), ARM. The undisputed evidence at trial was that the cost of child care exceeded Renn's earning power while a student. By not working outside the home, Renn estimated child care costs at a relatively low $117 per month. Renn calculated total living expenses for herself and the twins to range between $2,300 to $2,500 per month.

¶22    This Court consistently has upheld the principle that when a parent is voluntarily unemployed or under-employed, a court may impute income based upon his or her capacity and ability to earn. In re

Marriage of Hunt (1994), 264 Mont. 159, 170, 870 P.2d 720, 727; In re Marriage of Olsen (1993), 257 Mont. 208, 215, 848 P.2d 1026, 1030. The voluntary nature of the unemployment or under-employment status must be determined as a threshold matter. See, e.g., In Matter of T.J.H. (1996), 278 Mont. 74, 923 P.2d 1070 (full time waitress' earnings imputed to mother who opted for part-time work); Chiovaro, 247 Mont. 185, 805 P.2d 575 (coaching fees imputed to father who chose to refrain from coaching track); Mooney v. Brennan (1993), 257 Mont. 197, 848 P.2d 1020 (income imputed to incarcerated prisoner due to voluntary nature of criminal acts); In re Marriage of Weed (1992), 254 Mont. 162, 836 P.2d 591 (minimum wage earnings imputed to voluntarily unemployed parents).

¶23   We also recognize a parent's right to attempt to improve his or her financial position, even if doing so results in a temporary decrease in present income. In re Marriage of Syverson (1997), 281 Mont. 1, 10, 931 P.2d 691, 698 (no income imputed to mother while she was a full-time student); In re Marriage of Rome (1981), 190 Mont. 495, 498, 621 P.2d 1090, 1092 (decreased income resulting from father's decisions to change occupations and remarry was not so substantial and continuing as to justify recalculation and reduction of child support).

¶24   A district court's findings must "realistically reflect what the parents are capable of earning using their actual earnings as a guideline." Hunt, 264 Mont. at 170, 870 P.2d at 727 (quoting In re Marriage of Mitchell (1987), 229 Mont. 242, 248, 746 P.2d 598, 602). If a past employment position remains available and the parent has the ability to undertake the work, we have said that a court may impute that income to a party in a divorce proceeding. In re Marriage of Stufft (1996), 276 Mont. 454, 462, 916 P.2d 767, 772 (father resigned as manager of family-owned farm); Chiovaro, 247 Mont. at 189, 805 P.2d at 577 (father declined offered coaching position).

¶25   The record supports the conclusion that Benny voluntarily left his $90,000 per year position as a manager of operations at Bee Broadcasting and voluntarily remained unemployed for five months after the parties separated. The District Court found the $90,000 salary from the family-owned business to have been higher than prevailing wages in the local market and the record indicates that the operations manager position likely is no longer available to Benny. At the time of the dissolution, Benny was guaranteed $30,000 in annual consulting fees with Bee Broadcasting. Prospects for earning additional income at or above the level imputed by the court are supported by Benny's own testimony and that of his father and expert witness, Benny Bee, Sr., based upon prevailing wages and opportunities in the Seattle area radio market. Benny's decision to relocate to Seattle may have resulted in a short-term reduction in his income, but substantial evidence demonstrates Benny's potential to earn an additional $45,000 per year based upon his qualifications and prior experience when he is again employed full-time. We therefore hold the District Court did not abuse its discretion by imputing an additional $45,000 income to Benny for the purpose of child support calculations.

II.

¶26   Did the District Court err in setting spousal maintenance at $500 per month until Renn finishes her education?

¶27   We review a district court's award of maintenance to determine if the court's findings are clearly

erroneous.  In re Marriage of Lee (1997), 282 Mont. 410, 416, 938 P.2d 650, 654.  A district court may award maintenance after the marital property has been equitably divided pursuant to § 40-4-202, MCA, and the court has properly applied the criteria of § 40-4-203, MCA.  Weed, 254 Mont. at 168, 836 P.2d at 594.

¶28    An award of maintenance is dependent upon a finding by the court that Renn lacks sufficient property to provide for her reasonable needs and is unable to support herself through appropriate employment.  In re Marriage of  Zander (1993), 262 Mont. 215, 223-24, 864 P.2d 1225, 1231.   The court must consider Renn's financial resources, her ability to meet her needs independently, the time necessary to acquire sufficient education or training to become employable and the standard of living established during the marriage.  In re Marriage of Jorgensen (1979), 180 Mont. 294, 303, 590 P.2d 606, 612.  This Court recognizes that a public policy objective of rehabilitative maintenance is to promote self-sufficiency by giving the ex-spouse receiving maintenance an incentive to procure new job skills.  In re Marriage of Williams (1986), 220 Mont. 232, 238, 714 P.2d 548, 551.

¶29    The District Court found that Renn had no taxable income and that her reasonable monthly expenses were approximately $2,000, excluding the direct educational costs paid by the Pell grant and the children's day care and medical needs, which were assigned to Benny.  With $989 coming to Renn's household as monthly child support, Renn's only other source of income was a student loan, which provided her with approximately $576 per month.  Finding that Renn could not meet her needs, either through sufficient property or appropriate employment, the court ordered Benny to pay $500 monthly as maintenance from November 1, 2000 to May 31, 2002, while Renn remained in school.  Renn declared her intention to achieve economic independence with expediency, which informed her educational goals and decision to complete surgical technician training.  Given these factors, the court ordered spousal maintenance to cease upon the completion of Renn's education and suggested the parties then recalculate child support, insurance payments and other obligations to take into account Renn's new earning capacity.

¶30    Benny does not dispute that Renn lacks sufficient property to meet her financial needs, but argues that the District Court did not consider his ability to meet his own needs while providing maintenance to Renn, as required by § 40-4-203(2)(f), MCA.  He maintains that an award of maintenance should be based upon his actual income rather than including imputed income.

¶31    The Decree of Dissolution ordered Benny to pay $989 in child support; $166 for the children's insurance; $117 for child care; and $500 in spousal maintenance for a monthly total of $1,772.   Benny points out that his present income is only $2,500 per month, which leaves only $728 before taxes for his own living expenses each month.

¶32    When a party to a dissolution is in transition between jobs or temporarily under-employed, the district court may use imputed income when determining spousal maintenance in order to more accurately calculate the person's ability to pay.  See Rome, 190 Mont. 495,  621 P.2d 1090 (ex-spouse denied reduction in maintenance payments due to voluntary changes in employment and lifestyle that lowered his income).   The District Court found Benny had the ability to increase his income significantly in the near future based on his own testimony and that of his expert witness.  As noted

above, we have concluded that the imputation of an additional $45,000 income to Benny is supported by substantial evidence. Consequently, Benny's potential earnings exceed his present income by $3,750 each month. At the $75,000 income level imputed to Benny, he would have $4,478 in discretionary income each month after paying child support, child care, maintenance and the children's insurance. We hold the District Court did not err in setting spousal maintenance at $500 per month for the time that Renn is a full-time student.

## III.

¶33 Did the District Court abuse its discretion by valuing and distributing marital property and debts without a hearing?

¶34 The standard of review for marital property division employed by this Court is whether the district court's findings of fact are clearly erroneous. In re Marriage of Baer, 1998 MT 29, ¶ 29, 287 Mont. 322, ¶ 29, 954 P.2d 1125, ¶ 29. A district court has broad discretion pursuant to § 40-4-202, MCA, to distribute the marital estate in a manner that is equitable to each party according to the circumstances of the case. Baer, ¶ 30. The court has discretion to adopt any reasonable valuation of property supported by the record. In re Marriage of Luisi (1988), 232 Mont. 243, 247, 756 P.2d 456, 459.

¶35 Renn and Benny allocated the marital estate by stipulation prior to trial, with the exceptions of a requested equalization payment and a disputed deficiency debt. Renn contended that Benny received a greater share of marital property and asked the District Court to order an equalization payment in the amount of $5,813. Basing its findings on the personal property values submitted by Renn in her final disclosure statement and the fact that Renn withdrew $3,500 from the couple's joint savings account after separation, the court concluded Benny was not obligated to pay an equalization payment.

¶36 The deficiency debt of $13,904 related to a jointly-owned Ford Explorer used primarily by Renn. Prior to separation, the couple made monthly $750 car payments, which Benny continued making until the hearing on February 15, 2000. After the hearing, Benny offered to pay one-half of each subsequent payment. Since Renn could not afford to pay the balance each month, no additional payments were made. The bank repossessed the vehicle, auctioned it at foreclosure sale, and assessed the deficiency as debt.

¶37 The District Court found that Benny had the means to continue making full monthly payments on the vehicle because his father did not cash Benny's monthly rent checks after separation when Benny moved into a house owned by his father. The court stated:

Petitioner had to be aware that his checking account was not being debited for the $1200.00 per month rent expense. Therefore, the [c]ourt finds that Petitioner could have continued to make the payments of approximately $700.00 per month on the vehicle secured by the First Security Bank debt and therefore, the [c]ourt finds that the First Security Bank debt should be the obligation of the Petitioner.

¶38 Benny claims on appeal that he lacked notice of the District Court's intent to adjudicate the

equalization and deficiency debt disputes. While he does not contest the court's conclusion regarding the equalization payment, he requests that assignment of the deficiency payment be remanded for a hearing.

¶39 The record includes the final financial disclosure statements of both Renn and Benny. The District Court attributed the deficiency debt on the repossessed Ford Explorer to Benny based on credible evidence that Benny had the financial resources available to him during the separation to continue making monthly payments on the vehicle. We conclude that the court's findings are supported by substantial evidence in the record and are not clearly erroneous. We hold the court did not abuse its discretion by adjudicating the two outstanding martial property issues without a hearing.

IV.

¶40 Did the District Court abuse its discretion by assigning Renn's attorney fees to Benny?

¶41 Section 40-4-110, MCA, provides that a court may order a party to pay reasonable costs and attorney fees to the other party in any dissolution, parenting or child support proceeding after "considering the financial resources of both parties." The purpose of the statute is to ensure that both parties have timely and equitable access to marital financial resources for costs incurred before, during and after such proceedings. Section 40-4-110(2), MCA; In re Marriage of Schmieding, 2000 MT 237, ¶ 25, 301 Mont. 336, ¶ 25, 9 P.3d 52, ¶ 25.

¶42 We use a three-prong approach in deciding whether an award of attorney fees was appropriate pursuant to § 40-4-110, MCA. An award of attorney fees must be: (1) based on necessity; (2) reasonable; and (3) based on competent evidence. Schmieding, ¶ 25, Pfeifer v. Pfeifer (1997), 282 Mont. 461, 466, 938 P.2d 684, 687. Facts that we have traditionally considered in determining necessity are: (1) the requesting party's inability to pay his or her own attorney fees; (2) the other party's ability to pay attorney fees; and (3) the relative financial positions of the parties. Schmieding, ¶ 26.

¶43 We review a district court's award of attorney fees for abuse of discretion. In re Marriage of Pearson, 1998 MT 236, ¶ 30, 291 Mont. 101, ¶ 30, 965 P.2d 268, ¶ 30. This Court will not disturb a district court's findings on appeal if there is substantial evidence to support those findings. Zander, 262 Mont. at 227, 864 P.2d at 1233 (citing In re Marriage of Hall (1990), 244 Mont. 428, 435, 798 P.2d 117, 122).

¶44 The District Court ordered Benny to reimburse Renn for her attorney fees and costs based on a finding the Renn lacked sufficient funds to pay. Benny does not dispute Renn's inability to pay her attorney fees, nor does he contend her attorney fees are unreasonable. Benny claims only that the court did not take into account his own lack of financial resources, and cites In re Marriage of Zander, 262 Mont. 217, 864 P.2d 1225, for the proposition that when neither party is better able to pay, each party should be responsible for their own fees.

¶45 In Zander, this Court reversed the award of attorney fees to an ex-wife who enjoyed a substantially

greater monthly income than her ex-husband after maintenance, taxes and other payments had been subtracted. Zander, 262 Mont. at 228, 864 P.2d at 1234. As a result of the District Court's decree in the instant case, Renn's monthly income from a student loan, supplemented by child support for Isabella and Ezra and temporary maintenance, totals $2,065. The court found Benny has the potential to increase his actual monthly income of $2,500 to $6,250 by securing full-time work in the area of his professional expertise. When monthly child support, maintenance, child care and children's insurance costs are subtracted from Benny's actual income, $728 remains. However, when Benny's imputed income is used as the basis for projecting his ability to pay, his monthly income after court-ordered payments are subtracted is $4,478. Benny's potential to dramatically increase his earnings places the relative financial positions of the parties in high relief.

¶46    Other factors also bear on the resolution of this issue. While unemployed during the separation, Benny borrowed $20,000 from his father to meet his living expenses and support Renn and the children. The court noted in its findings that Benny Bee, Sr., would probably never collect the debt, and that Benny had access to the considerable financial resources of his father throughout the proceedings. Benny Bee, Sr., testified that he leased a new car for his son, paid Benny's attorney fees and cashed none of Benny's monthly $1200 rent checks.

¶47    The District Court found the fact that Benny Bee, Sr., relieved his son of litigation expenses enhanced Benny's ability to pay Renn's attorney fees and costs. The court also noted Renn was forced to incur substantially more in attorney fees than would normally be expected due to Benny's allegations of negligence resulting in Isabella's broken arm. Although Child Protective Services investigated the allegations, no charges of child neglect or abuse ensued. After the October 15, 2000, hearing, Benny dropped his request for full time parenting and agreed to a stipulated parenting plan that afforded primary parenting to Renn.

¶48    The record does not support a finding that Benny's concerns for the safety of the children were wholly without foundation, according to the expert medical testimony presented at the hearing on the matter. Nor does the record indicate that Benny irresponsibly caused Renn to incur higher attorney fees than normal because he behaved uncooperatively. However, proof of Renn's inability to pay her attorney fees in conjunction with competent evidence of Benny's release from the obligation to pay his own litigation costs and Benny's demonstrated capacity to earn considerably greater income in the near future support the District Court's award. We conclude the court did not abuse its discretion in awarding Renn reasonable attorney fees and court costs.

¶49    Finally, Renn asks this Court to award her attorney fees and costs for defending this appeal pursuant to § 40-4-110, MCA. This Court may award attorney fees incurred in defending an appeal under § 40-4-110, MCA, by considering the financial resources of both parties. In re Marriage of Moss, 1999 MT 62, ¶ 40, 293 Mont. 500, ¶ 40, 977 P.2d 322, ¶ 40; In re Marriage of Dorsey (1997), 284 Mont. 392, 397, 945 P.2d 430, 433. Sixteen months have passed since the District Court received evidence and reached its findings and conclusions regarding the imputation of income to Benny for the purpose of setting child support, maintenance, attorney fees and other payments at the trial stage. At this point in the proceedings, the record does not include up-to-date evidence regarding the parties' respective financial circumstances. We, therefore, decline to award Renn her attorney fees for this appeal pursuant

to § 40-4-110, MCA.

CONCLUSION

¶50    We conclude the District Court's imputation of $45,000 additional annual income to Benny is based on substantial evidence and does not constitute an abuse of discretion.  We further conclude there was substantial evidence to support the court's determinations of child support, spousal maintenance, allocation of the deficiency debt and equitable assignment of attorney fees.

¶51    We affirm.


/S/ PATRICIA COTTER


We Concur:


/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART


/S/ MARK L. GUENTHER
District Judge Mark L. Guenther sitting for
Chief Justice Karla M. Gray


/S/ KURT D/ KRUEGER
District Judge Kurt D. Krueger sitting for
Justice Terry N. Trieweiler


Justice James C. Nelson concurs and dissents.

¶52    I concur with our decision on Issue 3; I dissent from our decision on Issues 1, 2 and 4.

¶53    I cannot agree with the Court's decision affirming the trial court's imputation of $45,000 in income to Benny based on hypothetical job opportunities in the Seattle area.

¶54    First, I find nothing in the child support guidelines that allows the trial judge to consider evidence of out-of-state job markets in imputing income to an under-employed parent.  Specifically, 37.62.106(6)(d), ARM (2001), on which the majority rely, directs the court to assess "prevailing job opportunities in the community and earning levels in the community." (Emphasis added).  The "community" at issue here likely includes the Flathead Valley.  It does not, by anyone's stretch of imagination, however, include Seattle--with its vastly larger job market located hundreds of miles away.

¶55    Second, while I appreciate Benny presented evidence of jobs theoretically available in the Seattle area, he also testified that even though he had looked for work in that area, he had not found any jobs as a radio station worker, manager or program director.  Moreover, evidence presented by Benny's father, Benny Bee, Sr., not surprisingly, was to the effect that the higher income radio jobs in the Seattle area required one to work his way up from low level jobs.

¶56    Notably, neither the majority nor Renn cite any cases in support of the proposition that a parent's imputed income can be based on what the parent might earn in a vastly larger job market located hundreds of miles away from the community in which the parent resides at the time of the child support hearing.  To the contrary, however, we have stated that courts are obliged to consider the employment opportunities "available in the local job market for unemployed and under-employed parents."  In re Marriage of Wersland (1991), 249 Mont. 169, 172, 814 P.2d 991, 992 (citing In re Marriage of Gebhardt (1989), 240 Mont. 165, 172, 783 P.2d 400, 404).

¶57    And, not unlike the case at bar, in Gebhardt, we reversed the trial court's imputation of $40,000 in income to the father "based solely on [his] testimony that he supposed his salary would have doubled had he remained in California and the speculation of [the father's] former co-worker that [the father] could probably find a job in the aerospace industry."  Gebhardt, 240 Mont. at 171, 783 P.2d at 404.  As we noted:

> The court imputed $40,000 of income to LeRoy based only on his conjecture that had he remained in California, his salary might have doubled.  Obviously, LeRoy did not remain in California.  The findings of the trial court "[m]ust realistically reflect what the parents are capable of earning using their actual earnings as a guideline." (Citations omitted).

Gebhardt, 240 Mont. at 172, 783 P.2d at 404.

¶58    Benny's recent work history and voluntary under-employment are only part of the child support equation.  With those factors, the trial court is also obliged to consider prevailing job opportunities and earning levels in the community.  37.62.106(6)(d), ARM (2001).  Here, that requirement of the child support guidelines was misapplied.

¶59    If Benny is fortunate enough to land a $45,000 to $100,000 per year job in Seattle, certainly Renn may then petition the District Court to modify Benny's child support in accordance with the guidelines. Imputing income from such a job to him before he obtains it, however, is clearly wrong.

¶60    Since, in my view, the issues of maintenance and attorney fees hinged on the court's erroneous imputation of income, I would reverse and remand for further proceedings on these issues.

/S/ JAMES C. NELSON

District Judge E. Wayne Phillips, sitting for Justice Jim Rice, concurs in the foregoing dissent.

/S/ E. WAYNE PHILLIPS